UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| CLAUDIA R. BRADBERRY, | |
| Plaintiff, | |
| v. | Case No. 3:23-CV-981 JD |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**OPINION AND ORDER**

Plaintiff Claudia Bradberry appeals the denial of her claims for disability insurance benefits under Title II of the Social Security Act. For the reasons below, the Court will remand this case to the Agency for additional consideration.

**A. Background**

This is Ms. Bradberry's second time appealing the Agency's finding that she is not disabled. After review of her first appeal, the late Judge William Lee remanded the case for reconsideration. The ALJ's initial decision "acknowledged [Ms. Bradberry's] seizure disorder and migraine headaches were each 'severe impairments'" that significantly limited her ability to do basic work activities, but "assessed no time off-task as part of the RFC to deal with the actual occurrences of a seizure or migraine headache." (*Claudia B. v. Kijakazi*, No. 3:21-CV-674, R. at 544.) Consequently, Judge Lee found that "[t]he ALJ's decision include[d] no logical and accurate connection to the evidence in the record which [would provide] the Court an ability to

meaningfully review the ALJ's RFC assessment that [Ms. Bradberry] would never experience time off-task." (*Id*. at 545.)

Proceeding before the ALJ on remand, Ms. Bradberry maintained that she began suffering from seizures in 2018. (R. at 273, 275, 307.) On January 28, 2019, Ms. Bradberry had a brain MRI because of her history of epilepsy, which showed "findings suggestive of left mesial temporal sclerosis" and "white matter hyper signal intensities." (R. at 271.) She was started on medication and, by June 2020, Ms. Bradberry's neurologist, Dr. Jody Neer, noted that Ms. Bradberry believed she had been seizure-free since March but had developed migraine headaches in the interim.

At a visit with Dr. Neer in September 2019, she continued complaining about having daily headaches. She said that Excedrin Migraine and Maxalt helped, as well as massages, but Dr. Neer also prescribed Amitriptyline. In late 2019 and early 2020, Ms. Bradberry saw her family doctor, Julia Freeze, and Dr. Martin but did not list headaches or migraines among her concerns. In June 2020, she reported to Dr. Martin that she had recurrence of migraine headaches but attributed "at least part of this to running out of her prescription amitriptyline." (R. at 441.)

A year and a half later, in January 2022, Ms. Bradberry saw Nurse Practitioner ("NP") Beth Jones and reported daily headaches, most of which were migraines. (R. 839.) In July 2022, she complained to NP Jones of an increase in migraines, occurring at least two to three times a week, and she was prescribed Propranolol for prevention. In September 2022, she reported that the migraines had improved to about one per week (R. at 831), but by March 2023, the frequency of migraines worsened again, increasing two to three times a week. She attributed "some of the headache to menopause." (R. at 904.) The notes from her last medical visit in the record (April 2023) suggest that the migraines are better but not fully resolved: "She takes Nurtec 75mg and

Excedrin 250mg every other day helps with prevention. She is following up with Dr. Jones (Neurologist). She mentions that she had difficulty in sleeping [from] her migraine headache." (R. at 860.)

Two weeks later, Ms. Bradberry testified at the hearing that she was having incapacitating migraines at least four days per week, and that each episode lasted at least four to five hours. (R. at 483.) She stated that she was prescribed Nurtec two weeks earlier, but it hadn't helped, even though she had taken two or three extra doses beyond what was prescribed (R. at 483–84.) Ms. Bradberry testified that she had tried working for a short time as a cleaner in 2020 but had to stop because of headaches and exhaustion. (R. at 486.) She said that even now the headaches would disrupt her ability to work because their onset usually requires her "to be in a dark room, quiet." (R. at 486.)

The ALJ issued a decision finding that Ms. Bradberry was not disabled from June 20, 2019, through the date of the decision. (R. at 26.) In doing so, the ALJ employed the customary five-step analysis. At Step 2, the ALJ determined that Ms. Bradberry suffered from the following severe impairments: "seizure disorder, headaches/cerebrovascular disease, and chronic obstructive pulmonary disease ("COPD")/emphysematous changes." (R. at 449.)

At Step 3, the ALJ found that Ms. Bradberry did not have an impairment, or combination of impairments, that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 452.)

At Step 4, the ALJ determined Ms. Bradberry's residual functional capacity ("RFC"),[1] finding that she can

---

[1] "The RFC reflects 'the most [a person] can still do despite [the] limitations' caused by medically determinable impairments and is assessed 'based on all the relevant evidence in [the] case record.'" *Cervantes v.*

3

> perform a full range of work at all exertional levels but with the following non-exertional limitations: she can never climb ladders, ropes, or scaffolds. She should avoid concentrated exposure to vibration, fumes, odors, dust, gases, poor ventilation, humidity, extreme heat, extreme cold, and no more than moderate levels of noise (as defined in the DOT). She should avoid all exposure to unprotected heights, open flames, large bodies of water, unguarded moving machinery, sharp blades or brakes, and operation of a motorized vehicle. The claimant would likely be *off task up to five minutes at variable intervals approximately once a month on average*.

(R. at 453 (emphasis added).)

In fashioning the RFC, the ALJ reviewed, among other things, the opinions of State agency medical consultants. Dr. M. Ruiz issued his opinion on December 5, 2019, almost four years before the ALJ's decision. Dr. Ruiz opined that Ms. Bradberry "must avoid concentrated exposure to noise, vibration, and pulmonary irritants, and even moderate exposure to hazards." (R. at 458.) According to the ALJ, "Dr. Ruiz supported these limitations with imaging studies showing left mesial temporal sclerosis and non-specific white matter signal in the brain, but no acute intracranial hemorrhage, large acute infarct, or focal mass lesion, a normal EEG study, normal strength and steady gait, *reported daily headaches*, and follow-up visits showing a stable condition without recent seizures, including no seizures for an eight-month period." (*Id*. (emphasis added).) Five months later, State agency medical consultant Dr. Jerry Smartt adopted the same limitations.

The ALJ found that the two opinions were supported by the medical evidence at the time of their review and provided reasonable environmental limitations. However, the ALJ did not find the opinions persuasive insofar as they failed to consider time off-task given later evidence of "worsening headaches resulting in medication adjustments, as well as ongoing neurology follow-up for management of [Ms. Bradberry's] seizures." (*Id*.)

---

*Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) (quoting 20 C.F.R. §§ 404.1545, 416.945(a)).

Ultimately, the ALJ found that Ms. Bradberry was not disabled. In ruling against her, the ALJ determined that her claims of migraines conflicted with the evidence that "multiple neurologists and medical providers observed that she has had grossly normal neurologic exams, including no acute distress and normal cranial nerves, coordination, gait, Romberg testing, and sensation." (Def.'s Br., DE 20 at 8; R. at 457.) Likewise, the ALJ concluded that medications helped Ms. Bradberry to control the migraines. The ALJ noted that Ms. Bradberry used to experience migraines three times a week or more, but by September 2022, their frequency had decreased to once a week. (R. at 457.) According to the ALJ, Ms. Bradberry's report to Dr. Freeze in April 2023 "that Nurtec and Excedrin helped with migraine prevention," which she had begun taking two weeks earlier, undermines her testimony during the hearing that she was having the migraines despite taking the two medications. (*Id*.) The ALJ found it significant that Ms. Bradberry attributed "her headaches to menopause, which could suggest that the severity or increase in frequency was not related to her cerebrovascular disease." (*Id*.) Based on her findings, the ALJ determined Ms. Bradberry's environmental accommodations in her RFC: "due to the claimant's migraine headaches, the undersigned considered environmental limitations to accommodate her sensitivities to sound and/or any distraction by her headache symptoms." (R. at 457–58.) Finally, the ALJ found that Ms. Bradberry "would likely be off task up to five minutes at variable intervals approximately once a month on average due to seizure episodes lasting up to two minutes should they occur, as well as her migraine symptoms."

The ALJ determined that no greater functional limitations are warranted. In making this decision, she observed that Ms. Bradberry

> is able to take care of pets, prepare her own meals, perform household chores, and manage her personal care. She reported attending church and going out with her husband four times a month. It appears that, despite the claimant's allegedly disabling impairments, she has been able to engage in generally normal daily living

5

> tasks. She has not required hospitalization or more than routine neurological follow-up for these impairments.

(R. at 458.)

After the Appeals Council denied Ms. Bradberry's request for review of the ALJ's decision, she appealed to this Court.

**B.     Standard of Review**

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539

(7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to her or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**C. Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform her or his past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**D. Discussion**

In her appeal, Ms. Bradberry raises a single contention: she argues that the ALJ's finding that she would be off task only five minutes per month is arbitrary and unsupported by substantial evidence. The court agrees. As with the previous appeal, the ALJ's decision includes no clear or logical connection to the evidence in the record that would allow the Court to meaningfully review the ALJ's RFC assessment stating that Ms. Bradberry needs an accommodation of only five minutes a month of time off-task.

8

To begin with, the Commissioner notes that Drs. Ruiz and Smartt accounted for headaches by indicating that Ms. Bradberry should avoid moderate exposure to hazards and concentrated exposure to noise, vibration, and respiratory irritants. However, the ALJ went even further and added restrictions on operating motor vehicles, exposure to large bodies of water, and time off-task. Relying on *Dudley v. Berryhill*, 773 F. App'x 838, 842 (7th Cir. 2019), which affirmed an ALJ who assessed "limitations that were more restrictive than the functional work-related limitations identified by the state-agency doctors," *id*., the Commissioner believes this is an easy case. But the Commissioner overlooks the fact that Drs. Ruiz and Smartt issued their opinions in late 2019 and early 2020, before the full manifestation of Ms. Bradberry's migraine history in the record. In fact, their reports focus on epilepsy (R. at 82, 95) and refer only briefly to headaches, which in any case are different from migraines. Moreover, it appears unclear whether the environmental limitations were designed to address the causes of the seizures or the headaches. The Merriam-Webster Dictionary defines "headache" as "pain in the head." Merriam-Webster Dictionary, https://perma.cc/7K7Z-C9D4 (last visited Feb. 10, 2025). At one point or other, everyone has experienced this pain and, though it is unpleasant, it's not necessarily the kind of pain that can incapacitate a person. On the other hand, "migraine," while also a headache, is "a condition marked by recurring moderate to severe headache with throbbing pain that usually lasts from four hours to three days, typically begins on one side of the head but may spread to both sides, is often accompanied by nausea, vomiting, and sensitivity to light or sound, and is sometimes preceded by an aura and is often followed by fatigue." Merriam-Webster Dictionary, https://perma.cc/2NB3-SCA6 (last visited on Feb. 10, 2025); *see also* Migraine, https://perma.cc/2J9C-EK6R ("A migraine is a headache that can cause severe throbbing pain or a pulsing sensation, usually on one side of the head. It's often accompanied by nausea, vomiting,

9

and extreme sensitivity to light and sound. Migraine attacks can last for hours to days, and the pain can be so bad that it interferes with your daily activities.") (last visited Feb. 12, 2025). So the mere fact that the ALJ added more restrictions than the State agency consultants, who were reviewing the initial medical records and considered Ms. Bradberry's headaches instead of migraines, does not excuse the ALJ from explaining why the off-task limitation of five minutes every month sufficiently accounts for her impairment.

After all, the ALJ's own findings acknowledge that, while the frequency of the migraines varied, for most of the period under consideration Ms. Bradberry did experience migraines. And by definition, a migraine causes throbbing pain that lasts for a while. Unless the ALJ believes that Ms. Bradberry is now free of migraines, her five-minute off-task limitation requires additional explanation. Likewise, if the ALJ believes that the migraines are no longer present, she must explain the supporting evidence for such a conclusion. Since the beginning of 2022, Ms. Bradberry's medical records show that she consistently complained of migraines and was prescribed various medications to alleviate her suffering. While some records state that this or that medicine "helps," there's nothing suggesting that she has been cured of migraines. For example, the ALJ relies on the April 3, 2023, doctor visit, where the notes state that taking "Nurtec 75mg and Excedrin 250mg every other day helps with prevention. However, nothing in that note suggests a permanent resolution, or even describes to what extent the migraines are mitigated by the medications. On the contrary, the note recognizes that Ms. Bradberry "had difficulty in sleeping [from] her migraine headache." (R. at 860.)

Next, the Commissioner argues that the objective evidence supports the ALJ's off-task limitation. However, the Commissioner points to dubious evidence. According to the Commissioner, "multiple neurologists and medical care providers observed that she has had

grossly normal neurologic exams, including not acute distress and normal cranial nerves, coordination, gait" and so on. (Def.'s Br., DE 20 at 8.) Yet "[t]here is no single procedure that can confirm the diagnosis of migraines. Indeed, doctors frequently diagnose migraines when the described symptoms are typical, and results of physical and neurological examinations are normal." *Means v. Colvin*, No. 2:15-cv-01107-TFM, 2016 U.S. Dist. LEXIS 79768, at *15 (W.D. Pa. June 20, 2016). "While courts generally afford significant deference to an ALJ's credibility determination, an ALJ must be particularly diligent in making such determinations regarding migraine headaches because laboratory tests cannot prove their existence." *Id.* at *14. But in any case, even if Ms. Bradberry's claim that she periodically suffers from migraines is contradicted by examination results, the ALJ must explain that contradiction as it is not immediately evident. Moreover, the ALJ cites no medical opinion in support of the notion that the absence of a neurological explanation discounts the existence or intensity of Ms. Bradberry's migraines. On the contrary, as Ms. Bradberry points out, the presence of mesial temporal sclerosis ("MST") "is a prevalent finding in migraineurs." "Incidental finding of MTS in MRI should suspect physicians of migraine as well as temporal lobe epilepsy. MTS can be proposed as an etiology of migraine but most likely, consequence of it." (Pl.'s Br., DE 14 at 12 (quoting National Library of Medicine, New MRI Finding in Migraineurs: Mesial Temporal Sclerosis, https://perma.cc/Y5DA-VMXX).

      The Commissioner also argues that the ALJ considered Ms. Bradberry's daily activities and that they support her findings. But the fact that Ms. Bradberry is able to do household chores, exercise, care for her pets, do small household repairs, and attend church on Sundays does not establish, without more, that her off-task limitation should be only five minutes a month. Her claim is not that she suffers from migraines constantly, so her ability to feed a pet,

wash laundry, or go to church is not indicative of the fact that her migraines last only five minutes every thirty days or so. "The Seventh Circuit has cautioned ALJs about relying on vague descriptions of daily activities as a basis for finding disability claimant's statements about their limitations incredible." *Brandenburg v. Colvin*, No. 14-CV-835, 2015 U.S. Dist. LEXIS 105190, at *49-50 (E.D. Wis. Aug. 11, 2015) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) ("minimal daily activities" such as preparing simple meals, weekly grocery shopping, taking care of family member, and playing cards "do not establish that a person is capable of engaging in substantial physical activity"). Here, the ALJ's findings violate this warning.

As well, it is evident from the ALJ's decision that she "played doctor." The ALJ noted several times that, during multiple medical visits, Ms. Bradberry (a layperson) attributed her migraines to menopause. This observation appears to be a veiled suggestion that her migraines will cease with the end of menopause because they are not based on "any long-term vascular issues in the brain." (Def.'s Br., DE 20 at 9). This claim is not supported by any evidence in the record; it is mere speculation, and the ALJ may not base her decision on speculation.[2] *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence."). Again, the record is not so unambiguous that the five-minute off-task limitation is readily recognizable in the record. Instead, the Court is left with the strong impression that the ALJ

---

[2] While the Court makes no pronouncements about the etiology of migraines, and especially in Ms. Bradberry's case, it's worth noting that the thinking of migraines as being vascular has been called into question. *See* Oxford Academic, Brain; The vascular theory of migraine—a great story wrecked by the facts, https://academic.oup.com/brain/article/132/1/6/290677 (discussing a study that suggests the opposite conclusion to thinking of migraines as vascular) (last visited February 13, 2025); *see also* The Journal of Neuroscience; Migraine: Multiple Processes, Complex Pathophysiology, https://www.jneurosci.org/content/35/17/6619 ("There is currently no objective diagnosis or treatment that is universally effective in aborting or preventing attacks.") (last visited February 13, 2025).

arrived at his determination by playing doctor, that is, "substituting [her] opinion for that of a physician," which she may not do. *Seamon v. Astrue*, 364 F. App'x 243, 247 (7th Cir. 2010). Moreover, even if the ALJ were correct that menopausal changes caused the migraines, such a finding would not discount the fact that Ms. Bradberry was experiencing migraines, arguably, right up to the hearing.

Finally, the Commissioner argues that Ms. Bradberry has not shown that she requires a greater time off-task than found by the ALJ. But given that she has shown that she experienced migraines, and provided testimony regarding the disabling nature of those migraines during the period under consideration, this argument does not merit the Court's discussion. The ALJ makes no effort to explain or discount the disabling nature of Ms. Bradberry's migraines such that her off-task analysis is tied to the record evidence. The ALJ's omission to justify her conclusion is troubling especially in light of the vocational expert's testimony that missing work one day a week would be work-preclusive. (R. at 499–500.) To be clear, none of this is to say that the ALJ was required to find Ms. Bradberry disabled; the ALJ was however required to base her opinion on substantial evidence and explain it with "enough detail and clarity to permit a meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Since the ALJ failed in both respects, the Court must remand.

### E. Conclusion

For these reasons, the Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: February 18, 2025

                                                  /s/ JON E. DEGUILIO
Judge
United States District Court